Filed 12/22/25  P. v. Fitzhugh CA3
Opinion following transfer from Supreme Court

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ALPHONZE FITZHUGH,<br><br>      Defendant and Appellant. | C099624<br><br>(Super. Ct. Nos. STK-CR-FE-2011-0005309, SF117037A)<br><br>OPINION ON TRANSFER |

Defendant Alphonze Fitzhugh appeals from a postjudgment order denying his petition for resentencing under Penal Code section 1172.6.[1]  He and codefendant Robert Antonio Barnes were found guilty of first degree murder, attempted murder, and attempted robbery.  The jury found true the special circumstance that Fitzhugh committed the murder during the commission or attempted commission of a robbery.  (§ 190.2, subd. (a)(17)(A).)  He was sentenced to nine years plus life without the possibility of parole, and we affirmed his convictions on direct appeal.  Fitzhugh later petitioned the trial court for resentencing based on changes to the felony-murder rule under Senate Bill No. 1437

---

[1]     Further undesignated statutory references are to the Penal Code.

1

(2017-2018 Reg. Sess.) (Senate Bill 1437) (Stats. 2018, ch. 1015, § 4).  After an evidentiary hearing, the superior court denied the petition, finding the People proved beyond a reasonable doubt that Fitzhugh was a major participant who acted with reckless indifference to human life.

In an unpublished opinion, we affirmed the denial of the petition.  We concluded that, reviewing the entire record in the light most favorable to the judgment, substantial evidence supported the trial court's conclusion that Fitzhugh was a major participant who acted with reckless indifference to human life.  The California Supreme Court subsequently granted review and transferred the matter to us with directions to vacate our opinion and reconsider the cause under *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*).  By separate order, we vacated our decision.

In supplemental briefing after transfer, Fitzhugh contends that application of the factors from *Emanuel* demonstrates that he did not act with reckless indifference to human life.  We disagree.  As explained below, having reconsidered the matter, we conclude our original determination is consistent with *Emanuel* and we see no need to deviate from our original findings and conclusions.  We will, however, modify our opinion to specifically address *Emanuel*.

## LEGAL AND FACTUAL BACKGROUND

### I

### *Facts Relevant to the Conviction*

We take the underlying facts from the unpublished opinion we issued in 2018 affirming Fitzhugh's convictions in *People v. Barnes* (Nov. 30, 2018, C073287) (*Barnes*).[2]

---

[2]    We provide this summary of facts from the prior opinion in Fitzhugh's direct appeal for context.  In analyzing the issues, we rely upon the trial transcript, admitted at the People's request and relied upon by the parties during the evidentiary hearing.

"*A.     The Shooting*

      "On November 18, 2009, Britani lived with her boyfriend, Evan, in her parents'
garage in Acampo.  The garage had been converted into a one-bedroom apartment.  That
night at around 8:00 or 8:30 p.m., Britani and Evan went to Lodi to purchase fast food.  It
was a seven- to ten-minute drive.  Britani drove.  When they returned home, she parked
in the driveway.  It was very dark.  Britani and Evan walked to their front door side by
side.  When Evan went to put the keys in the door, a man turned the corner raising a gun
at Evan.  Britani screamed and Evan ran.  As Evan ran, he heard five or six gunshots.  A
bullet went straight through his left leg.  The shooter was dressed in dark clothing with
gloves and a beanie or a ski mask such that Evan never saw his face.

      "Britani's mother thought she heard five gunshots.  V.S. and James also lived in
Britani's parents' house with their two children.  V.S. heard between five and seven
gunshots.  Britani's mother and V.S. both called 911.

      "Meanwhile, James went outside, where he found Britani.  She did not have a
pulse and she was not breathing.  Evan came and put her on the steps.  As he did so, she
let out a gasp of air.  Evan gave her CPR.  Britani was taken by ambulance to a hospital,
where she was pronounced dead.

      "A neighbor heard at least four or five gunshots and went outside and saw a man
run by and get into an SUV that was parked near the neighbor's truck.  The driver turned
off the vehicle's lights and drove away slowly.

      "Britani died of a gunshot wound to her torso.

      "Two spent .380 ACP cartridges and three bullets were found at the crime scene.
Two of the bullets were .380s.  The third bullet was a .38 Special or .357.  An expert on
firearms examination opined that both cartridge cases were fired from the same firearm.

_____

(§ 1172.6, subd. (d)(3).)  We also separately granted Fitzhugh's request to incorporate the
appellate record in *Barnes, supra*, C073287 into the record for the present appeal.

3

"Law enforcement also found two digital scales, more than 250 grams of marijuana, and $500 in cash.  Evan testified there was $8,000 in a purse.

"*B.     Cellular Phone Records and Testimony of Defendants' Acquaintances*

"*1.     Planning*

"Evan and Fitzhugh used to be friends.  They both sold marijuana, and Fitzhugh taught Evan how to make money selling drugs, but Evan no longer respected Fitzhugh.  Fitzhugh had also been close friends with Britani.  At one point, Britani had considered being Fitzhugh's girlfriend.  This had also caused the two men not to like each other anymore.

"Joshua[3] testified that, while selling him marijuana in the late summer of 2009, Fitzhugh asked Joshua where Evan was living.  On August 24, 2009, Fitzhugh texted Joshua, 'Just remember bruh loose lips sink ship keep erything we spoke on between us real shyt and we can fuck wit eachother all day  [¶]  NICCAZ CROSSIN GAME GET DA BLUES.'[4]  After Joshua agreed, Fitzhugh added, 'off top no pillow talkin thys shyt aint for the faint or week at heart the game is thick make ya next move be ya best move [¶] NICCAZ CROSSIN GAME GET DA BLUES.'[5]  Fitzhugh also wrote, 'Remember what I said about dat let me know whens a guhd time soon ta get dat and split dat one time figgadeel me  [¶]  NICCAZ CROSSIN GAME GET DA BLUES.'  Joshua testified

---

**3**     Joshua was one of many who were a part of Fitzhugh's social network.

**4**     "Joshua testified that he recognized the repeated phrases at the end of Fitzhugh's text messages.  Because defendants raise claims regarding the admission of Fitzhugh's full text messages, including the 'tag lines' at the end, we include the tag lines to which counsel objected so that the reader may view the impact of these tag lines in context."

**5**     "Joshua understood this message to indicate that selling marijuana is a difficult market."

before the grand jury that this text basically meant that Fitzhugh wanted to know when it would be a good time to go after and get Evan.

"Aaron testified under a grant of immunity that Fitzhugh asked him to find out Evan's location.[6]  Fitzhugh, Barnes and Aaron all discussed robbing Evan.  Aaron 'would be one of the robbers' which meant he 'would run up on [Evan] and . . . draw a gun on him and probably take him into the house or something like that, tell him to give me the money and then get in the car and take off.'  Fitzhugh would be the driver and Barnes said he would be one of the robbers.  Whoever was in the car would be a lookout.  There was not a specific date planned because Britani and her parents were always home.

"Fitzhugh sent numerous text messages to various individuals as he prepared for and planned the robbery.  We set forth only the most relevant to the issues on appeal.  On September 7, 2009, Fitzhugh sent text messages to an unknown person stating, 'I need a quick lick[7] ta get somer more artilery than I'll be ready ta get ears.'[8]  He added, 'Im dam near ready ta hit ears but I need artilery for the bigger licks we got on deck !'

"On September 22, 2009, Fitzhugh texted Barnes, 'We needta get somemore shells 2marow when rok get hia car back  [¶]  Young Baby Faced A$ $a$in 4real.'  The following day, he texted an unknown person that he might need them to buy ammunition for him.  He used the tag line 'Young Baby Faced A$ $a$in 4real' in these messages as well.  On September 26, 2009, he texted someone else, asking them to buy 'a few boxes of shells for a few of my guns.'  By this time, he had changed his tag line again.

---

**6**    "Aaron pled guilty to assault with a deadly weapon in an unrelated case and received credit for time served.  The San Joaquin County District Attorney's Office paid Aaron $28,479.40 in relocation expenses from April 25, 2011, through the day he testified."

**7**    Aaron testified that a "lick" is a robbery.

**8**    "Evan's nickname was 'Long Ears.' "

5

"On October 5, 2009, Fitzhugh wrote to the unknown co-conspirator from his September 7, 2009, exchange, 'U need ta get in that house an setchure eyes on that safe an loot bby its go time  [¶]  Dominant Species On the Planet!!'  The person wrote back, 'Idk how to get any more info i gave you what i could fonz its in your hands now.  evena girl jas alll the money at her house since evens locked up.'  Later that day, Fitzhugh wrote, 'Ok baby so he's gotit all at britts an hopefully in the pool house than right  [¶]  Dominant Species On the Planet!!'  The person responded, 'Yeah last i heard she and him were living there.  Ill keep a look out on it.  But 95% sure its all there and shit..'  Fitzhugh replied, 'Ok Im ready ta do it now it'd be better if danny hadit honestly but if its in her pool house thatd be perfect 2  [¶]  Dominant Species On the Planet!!'  The next day, he wrote, 'Bby Im ready ta go hav u heard anything new Im locked an loaded ready ta go  [¶]  1 Date Will United Us All The End.'  Fitzhugh also texted Carlos, 'Bruh keep yo mouth shut on dat bidness if we jump the gin to fast that whole licks over it aint for sertain he got the shyt thr  [¶]  1 Date Will Unite Us All The End.'[9]  A few minutes later he reiterated, 'Dnt be tellin 2 many boutit if we jump the gun an hit the house an he keepin it at danny's we lose the window of oppertunity  [¶]  1 Date Will Unite Us All The End.'  Fitzhugh also wrote, 'Once my bitch set eye's on the prize we in there erybody to hungry an aint got all the fact strate ta go in blind  [¶]  1 Date Will Unite Us All The End.'

"On October 8, 2009, Fitzhugh texted Carlos, 'I hope you aint buisey 2day bruh cause we need ta be out trynna catch dis nicca slippin[10] out here  [¶]  1 Date Will Unite

---

**9**     "The grand jury returned an indictment against Carlos in this case.  He pled guilty to being an accessory after the fact to murder in exchange for a 14-month sentence he had already served and his truthful testimony against defendants."

**10**     "Carlos testified that this means to catch someone by themselves.  Aaron testified it meant to catch Evan off guard."

Us All The End.' Carlos replied, 'Who.' Fitzhugh answered, 'Evan we gotta wate out there by his house an see if we can catchum slippin bru so come outchia wit rob at like 6:30 its go time [¶] 1 Date Will Unite Us All The End.' Later, he added, 'Yup just come witchu an rob g so we aint 2 deep an he got my jack cloths [¶] 1 Date Will Unite Us All The End.'[11]

"On October 16, 2009, Fitzhugh texted the unknown co-conspirator, 'Does long ears still drive that white car wit the rims or brittneys car [¶] DaNcE WiTh ThE DeViL.' Within the next 30 minutes, Fitzhugh texted the unknown co-conspirator and Aaron that he just saw 'him' jump in the car with 'brittney.' An hour and a half later, Fitzhugh wrote to yet another person, 'Im here waitin on u bru u knw I gotchu jus say the word [¶] DaNcE WiTh ThE DeViL.' An hour after that, he texted Carlos, 'Dnt forget the backpack bro bro [¶] DaNcE WiTh ThE DeViL.'[12]

"On October 17, 2009, Carlos texted Fitzhugh, 'Hey i waz checkin out tha spot and thy put a blakc safe in tha kar it waz a lil safe.' Fitzhugh complimented Carlos on his surveillance: 'Good job brodi watchum u like a special opps type if I was witchu that woulda been the perfect timing [¶] yA bOy FlyA ThAn A 911 tErRoRisT.'

"On October 28, 2009, Barnes texted Fitzhugh, 'I AM, FINNA G0 GET DA MASK N M0E SHELLZ N AH ALREADY G0T SUM NEW FRANKLINZ. GWAP_GETTAZ.' Carlos testified that he drove Barnes to a sporting goods store to buy tight-fitting gloves.

"Carlos's ex-girlfriend testified that she heard Fitzhugh talk about wanting to kidnap Evan over money or drugs. She went to a Halloween party in 2009 with Carlos, Fitzhugh, Barnes and Michael. That night, Carlos and his ex-girlfriend went to Barnes's

---

**11**    "Carlos testified that 'Rob G.' is Barnes's nickname and to 'jack' someone is to rob them."

**12**    "Carlos testified that Barnes kept a gun in a backpack."

house. She told law enforcement that Fitzhugh pulled a 'western style' revolver out of his waistband. Carlos testified that he saw a firearm in a backpack at Barnes's house. Michael also testified, under a grant of immunity, that Fitzhugh had a revolver that evening.

"Additionally, Michael testified that he sold Fitzhugh bullet-proof vests. He also explained that 'burner gloves' are gloves that a person 'should wear when firing a weapon,' such as Franklin baseball gloves. After he was shown a photograph, Michael testified that the purpose of the gloves was to keep fingerprints off the gun.

"On November 6, 2009, Fitzhugh texted Michael, 'We need ta go test them vests out bru up ta what calibur can the stop do u knw [¶] What Is A Bitch Gone Do 4 Me?' The next day, Fitzhugh wrote, 'If u or jimmy come across bigger vest longer at least less do it again [¶] What Is A Bitch Gone Do 4 Me?' Michael responded, 'fsho those vests is jus meant to cover all your vital organs nd shit.' Fitzhugh replied, 'I knw but ya kidneys is pretty vital I wish I still had my level 4 teflon [¶] What Is A Bitch Gone Do 4 Me?'

"2.    November 18, 2009

"On November 18, 2009, from 1 p.m. until 7 p.m., Fitzhugh's cell phone and Barnes's cell phone were in downtown Stockton. At 6:25 p.m., Barnes texted 'MAKE UP' to Fitzhugh. Fitzhugh replied, 'YUP [¶] Religious About The Cliterus!' Thirty minutes later, Barnes wrote, 'WERE YAW GO?' Fitzhugh responded, 'We'll be ther now [¶] Religious About The Cliterus!' At 6:59 p.m., Fitzhugh wrote, 'Yah come on so we can get eggie [¶] Religious About The Cliterus!' At 7:00 p.m., he wrote, 'Bring my back pack bru iss on yo bed [¶] Religious About The Cliterus!' At 7:53 p.m., Barnes's cell phone was headed north on Highway 99 in the Lodi area. From 8:09 p.m. through 8:33 p.m., Barnes's phone was in the area of the crime scene. From 8:09 p.m. through 8:32 p.m., Fitzhugh's phone was in the area of the crime scene. During this time, Fitzhugh and Barnes made five calls to each other. The first four each lasted between 52 seconds

8

and one minute and 32 seconds.  The last call, at 8:32 p.m., only lasted 18 seconds.  The first 911 call was made at 8:38 p.m.

"At 9:03 p.m., Fitzhugh's phone was in the area of East Hammer Lane in Stockton, headed west toward Interstate 5.  At 9:14 p.m., the phone was headed south on Interstate 5.  At around 9:30 p.m., both Barnes's and Fitzhugh's cell phones were back in downtown Stockton.

"Aaron testified that defendants came to his home that evening.  Fitzhugh appeared '[f]rantic, crying.'  Barnes was not crying, but he seemed 'kind of frantic.'  Fitzhugh told Aaron the robbery 'went bad' and Britani was shot.  Fitzhugh said only he and Barnes were there.[13]  Fitzhugh said he was in the car at the time, but he heard two shots and Britani's scream.  Barnes said he 'ran up on' Evan, that Evan threw a drink at Barnes, and Barnes shot Evan in the leg as he was locking the door.  Britani screamed, startling Barnes, and the gun went off.  Barnes said he shot twice with a .380.  Both defendants said they did not intend to kill Britani.  That evening, Fitzhugh texted Carlos, 'We never even left ta do shit the party we was going to got canceled aite bru so dnt feel left out  [¶]  Religious About The Cliterus!'  Next, Fitzhugh texted Aaron about watching the local news regarding the murder.

"The following day, Barnes sent a text stating, 'BABE WEN U G0T TIME GET ME SUM 380 BULLETS.'

"Aaron went to Santa Cruz for three weeks because he was scared and concerned about being an accomplice.

"C.    Investigation

"On December 8, 2009, Fitzhugh spoke to law enforcement.  He gave them his telephone number.  He also said he shot a .357 two weeks prior.

---

**13**    "Aaron was supposed to go, but he had a leg injury that prevented him from going."

"Sheriff's deputies searched a Stockton home and found items of indicia with Fitzhugh's and Barnes's names on them as well as a leather holster, a black cotton glove, and a round of .38 Special plus P ammunition." (*Barnes, supra*, C073287.)

A jury found Fitzhugh and Barnes guilty of first degree murder (§ 187—count one), attempted murder (§§ 664, 187—count two), and attempted robbery (§§ 664, 211—count three) and found true the robbery-murder special circumstance (§ 190.2, subd. (a)(17)(A)). Although the jury found true that Barnes had personally and intentionally discharged a firearm in the commission of all three counts, it found the same firearm enhancements not true as to Fitzhugh (§ 12022.53, subd. (d)). Fitzhugh was sentenced to nine years plus life without the possibility of parole.

## II

### *Direct Appeal*

Fitzhugh appealed his convictions, arguing, among other things, that insufficient evidence supported the jury's robbery-murder special-circumstance finding as to him. Although Fitzhugh did not challenge that he was a major participant, he argued that the evidence was insufficient to show he acted with reckless indifference to human life.

A different panel of this court rejected all of Fitzhugh's contentions and affirmed the judgment in its entirety in November 2018. In upholding the jury's robbery-murder special-circumstance finding, this court relied on our Supreme Court's decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) to conclude there was substantial evidence that Fitzhugh acted with reckless indifference to human life during the offenses. (*Barnes, supra*, C073287.)

## III

### *Section 1172.6 Proceedings*

In February 2019, Fitzhugh filed a petition for resentencing under what is now designated as section 1172.6, alleging that as the getaway driver during a robbery of a drug dealer he could not now be convicted of murder because of the changes Senate Bill

1437 made to sections 188 and 189. Fitzhugh requested the court appoint him counsel and issue an order to show cause.

In March 2019, the trial court summarily denied Fitzhugh's petition after finding he was ineligible for resentencing given the jury's true finding on the robbery-murder special circumstance. The court reasoned that in finding the special circumstance true, the jury necessarily found Fitzhugh was a major participant who acted with reckless indifference to human life during the crimes. The court also noted that this court subsequently found sufficient evidence supported the jury's special circumstance finding.

Yet another panel of this court initially affirmed the court's order denying Fitzhugh's resentencing petition, holding that any error in failing to appoint Fitzhugh counsel was harmless error given the jury's true finding on the robbery-murder special circumstance, which this court had previously upheld in Fitzhugh's direct appeal. After the California Supreme Court granted review and transferred the matter back to us with directions to vacate our opinion and reconsider the cause in light of *People v. Strong* (2022) 13 Cal.5th 698 and *People v. Lewis* (2021) 11 Cal.5th 952, we agreed with the parties that Fitzhugh's petition was facially sufficient under *Lewis* to require the appointment of counsel and briefing, and that under *Strong* neither the jury's true finding on the robbery-murder special-circumstance allegation nor this court's conclusion on direct appeal that substantial evidence supported the special circumstance finding, preclude Fitzhugh from relief under section 1172.6 as a matter of law. This court reversed the court's order and remanded the cause for further proceedings. (*People v. Fitzhugh* (Dec. 20, 2022, C089261) [nonpub. opn.].)[14]

---

[14] On our own motion, we take judicial notice of our records. (Evid. Code, § 452, subd. (d); see also Pen. Code, § 1172.6, subd. (d)(3) [In an evidentiary hearing pursuant to Pen. Code, § 1172.6, the court may also consider the procedural history of the case recited in any prior appellate opinion].)

On remand, the trial court appointed counsel for Fitzhugh, issued an order to show cause, and conducted an evidentiary hearing on the petition. At the hearing, the parties relied on evidence produced at trial. In addition, Fitzhugh called one witness to testify as to the possible time it took for the victims to drive from the fast-food restaurant to their home.

The trial court ruled as follows: "So the Court has to decide whether Mr. Fitzhugh acted with reckless indifference to human life on the night that Britani . . . was killed. Because we all are very clear that Mr. Fitzhugh was a major participant. And as the case law says, these are intertwined. . . . [¶] Mr. Fitzhugh was tracking Evan . . . for months, since late August, September, trying to find out where he was. And in the meantime, asking—getting ammunition and guns and the bulletproof vest. And you only get a bulletproof vest if you think there's a chance that you're going to get shot at. If you think you're going to get shot at, then you have already realized that what you're doing is dangerous to human life."

The court then distinguished the instant case from *Clark, supra*, 63 Cal.4th 522,[15] stating: "Those are quite different facts to Mr. Fitzhugh, who on the night that he text[ed] Barnes to go to the [victims's] house, 'Bro, bring my backpack.' And there was witnesses that testified that Mr. Fitzhugh kept a gun in his backpack. So this Court finds that circumstantial evidence shows that, no, there was not one gun, there was—there were two guns. And the presence of that bullet at the scene, as [the prosecutor] said always bothered him. I was the trial court that heard this case, and that always gave me pause as

---

[15] In *Clark*, the evidence was insufficient to show the defendant acted with reckless indifference to human life in the armed robbery of a computer store when he planned the robbery but was not armed or physically present in the store when the victim was shot, did not have the intent to kill, and attempted to minimize the likelihood of violence by planning the robbery to take place when fewer people would be present and by using an unloaded gun. The gun used had only one bullet. (*Clark, supra*, 63 Cal.4th at pp. 611, 618-623.)

12

well.  [¶]  But Mr. Fitzhugh again got—grew tired of waiting to catch Evan on his own. And that also, himself, he didn't want Britani . . . around because he knew there could be a danger to her.  And I do think that he cared about her.  So he was trying to minimize that.  But in the end, he decided not to.  [¶]  And so to go to someone's home—and now we are looking at basically what was to be a home invasion, which was to at gunpoint move Evan and Britani into their house and take their safe, late at night, with the other—the—Britani's parents were also at home.  So that's different than trying to find him on the streets on his own.  Or if they really were going to do a burglary, then they would have been asking their spies to tell us, hey, tell us when you know that nobody is there.  I do not think that this was ever going to be changed from a robbery to a burglary . . . .  He could have minimized the risk to Britani.  He could have called Barnes and called it off. He had been thinking about this for months.  [¶]  Again, this isn't a spontaneous, hey, let's go rob someone . . . .  [¶]  It's absolutely true what [the prosecutor] says, that but for Mr. Fitzhugh, Britani . . . would not be dead."

The court then compared the instant case to *People v. Bradley* (2021) 65 Cal.App.5th 1022, where the defendant spontaneously agreed to commit a robbery with a loaded firearm and was found to be a major participant with reckless indifference to human life.  According to the trial court, Fitzhugh was more culpable than the defendant in that case.

The court continued:  "This Court has granted of a number of these petitions.  I have resentenced at least four to five defendants, finding that they did not act with reckless indifference, that they—they were the type of defendant that I feel this legislature was trying to protect, the aider and abettor that didn't know his cohorts were armed, the aider and abettors that weren't armed at all, the true look-out.  That—those— those defendants, under the old law, were just as culpable and were able—were sentenced to LWOP.  That's the type of defendant the legislature was thinking of when they passed this.  [¶]  Again, I find that the circumstantial evidence that Mr. Fitzhugh was armed, he

13

knew of the danger of doing this. This happened at a residence at night. He could have called Mr. Barnes and called this off. He knew this was dangerous because he had spent months trying to do this robbery without Britani being present. He acquired bulletproof vests. And having—hearing shots, he—he could have gotten out and tried to help Britani. He didn't know if he could have rendered aid, but he didn't. [¶] He was seen with a revolver back in October. And when he was interviewed by the police, he said he had shot a .357 two weeks prior. [¶] So I do find that Mr. Fitzhugh is guilty beyond a reasonable doubt, that he was a major participant that acted with reckless indifference to human life. So I'm denying his petition to be resentenced."

## DISCUSSION

### I

### *Denial of Petition for Resentencing under Section 1172.6*

#### A. *Senate Bill 1437 and Standard of Review*

Senate Bill 1437 amended the felony-murder rule to provide: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2 [the statute defining felony-murder special circumstances]." (§ 189, subd. (e).) The new law was designed "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

14

The Legislature also added former section 1170.95 (now § 1172.6), which establishes a procedure for offenders previously convicted under a felony-murder theory to obtain the benefits of these changes retroactively. As relevant here, under the new law offenders can petition for relief in the court where they were sentenced if: (1) the complaint or information filed against them "allowed the prosecution to proceed under a theory of felony murder"; (2) they were convicted of murder following a trial; and (3) they could not now be convicted of murder "because of changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a).) If a petitioner makes a prima facie showing of entitlement to relief, the trial court shall issue an order to show cause (§ 1172.6, subd. (c)) and hold an evidentiary hearing at which the prosecution bears the burden of proving "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under the law as amended by Senate Bill 1437. (§ 1172.6, subd. (d)(3).) The parties may offer new or additional evidence at the hearing, and the trial court sits as an independent fact finder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

We review a trial court's denial of a section 1172.6 petition for substantial evidence. (*Emanuel, supra*, 17 Cal.5th at p. 885.) Accordingly, "we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact' " ' " could find beyond a reasonable doubt that Fitzhugh acted with reckless indifference. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

B.    *Additional Background and Trial Court's Findings*

Before we begin our analysis of whether the evidence supports the trial court's denial of Fitzhugh's petition, we must address his allegation that legal and factual error tainted the trial court's conclusions.

15

Initially, we reject Fitzhugh's claim that the trial court applied the wrong legal standard in assessing his culpability in the murder when, citing to Fitzhugh's acquisition of firearms, ammunition, and bulletproof vests, it stated, "If you think you're going to get shot at, then you have already realized that what you're doing is dangerous to human life." Contrary to Fitzhugh's claim, the court was not applying a "dangerous to human life" standard. Rather, this statement was one of many factors discussed by the trial court in considering the ultimate question of whether the People proved beyond a reasonable doubt that Fitzhugh was a major participant who acted with reckless indifference to human life. Indeed, the court reiterated the correct standard multiple times.

We also disagree that the court's additional comments about the type of accomplices the Legislature intended to reach with Senate Bill 1437 demonstrates it employed the wrong standard. The court stated that it had resentenced "at least four to five defendants, finding that they did not act with reckless indifference, that they—they were the type of defendant that I feel this legislature was trying to protect, the aider and abettor that didn't know his cohorts were armed, the aider and abettors that weren't armed at all, the true look-out." Fitzhugh argues this reasoning is at odds with "the statute's overall purpose: to ensure that murder culpability is commensurate with a person's actions" (*People v. Lewis, supra*, 11 Cal.5th at p. 971), where "[a] sentencing body must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime" (*Banks, supra*, 61 Cal.4th at p. 801). As Fitzhugh notes, armed accomplices who directly participated in the robbery have been granted sentencing relief. (See, e.g., *People v. Keel* (2022) 84 Cal.App.5th 546, 561-563.) However, we conclude the court's statements were an attempt to contrast Fitzhugh's involvement in the robbery murder with that of defendants whose conduct place them on the end of the spectrum who did " 'not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' " (*Banks*, at p. 799.)

16

Nevertheless, because substantial evidence supports the court's finding that Fitzhugh was a major participant who acted with reckless indifference to human life, Fitzhugh cannot show any prejudice by the court's erroneous comments. (See *People v. Vance* (2023) 94 Cal.App.5th 706, 717 [challenge to the trial court's failure to apply the beyond a reasonable doubt standard in a § 1172.6 evidentiary hearing failed because the petitioner did not show prejudice].)

Fitzhugh next argues the trial court misinterpreted the evidence regarding his acquisition of ammunition, guns, and bulletproof vests. In September 2009, Fitzhugh texted various people to obtain ammunition; one text sought "a few boxes of shells for a few of my guns." One accomplice took Barnes to get gloves for the purported purpose of preventing fingerprints. Sometime before Halloween, Fitzhugh bought bulletproof vests from Michael. He and Michael discussed the type of bullet the vest would stop, and Michael assured him it would stop a 9-millimeter bullet and that it was meant to cover vital organs. There is no evidence the vests were actually tested. The parties have not identified, nor have we identified, any evidence that the vests were worn on the night of the murder. The evidence suggests otherwise. Evan, the attempted murder victim, described the shooter as wearing a dark sweater, pants, gloves, and a mask or a beanie. Aaron testified that when Fitzhugh and Barnes came to his house after the murder, Fitzhugh was wearing a shirt and Barnes was wearing a sweater. Thus, to the extent the trial court relied on the fact that Fitzhugh wore a bulletproof vest on the night of the shooting, that is not supported by substantial evidence.

With respect to the bullets used that night, the firearms examiner examined two expended cartridge casings that held .380 auto caliber bullets and came from the same gun. He also examined three bullets: two were .380 ACP bullets and one was either a .38 Special or a .357. According to the expert, the .357 or .38 Special caliber bullet could not be fired in a .380 cartridge case. Nor could a person load a .357 cartridge into a .38 Special weapon. But a person could load a .357 revolver with either a .38 Special

17

cartridge or a .357 cartridge. He also explained that it is more common for revolvers to fire .357 or .38 Special cartridges and, if fired from a revolver, the cartridge case would not be expelled.

Michael and Carlos saw Fitzhugh in possession of a revolver on Halloween. When Michael was asked if the gun was ever kept in a backpack, he responded affirmatively and said the backpack belonged to Fitzhugh. He said Fitzhugh did not always carry the backpack with him. Carlos said that every time he saw the firearm, it was in a backpack. According to Carlos, only Fitzhugh had the revolver; Barnes had a more modern pistol. Carlos explained Fitzhugh had the gun whenever he went to Lodi.

On the night of the murder, Fitzhugh texted Barnes to "[b]ring my backpack, bro. Is on yo bed."

When the police first interviewed Fitzhugh on December 8, 2009, he said he fired a .357 firearm two weeks earlier, which would have been around November 24.

Fitzhugh argues that the trial court misinterpreted the facts to conclude that he was armed that night and to adopt a "dual gun theory" that tainted the entire ruling on the petition for resentencing. The People contend there was substantial evidence to support the trial court's conclusion that Fitzhugh was armed that night. We disagree with both positions.

We find the evidence established that before and after the shooting, Fitzhugh had access to a firearm and, in particular, a revolver that was sometimes stored in his backpack. On the night of the murder, Fitzhugh asked Barnes to bring his backpack. However, there is no evidence that, on that night, the backpack contained Fitzhugh's revolver or that Barnes actually brought the backpack to the robbery. Nor is there any other evidence that Fitzhugh possessed a firearm on the night of the murder.

The only evidence suggesting a second gun was used that night was the presence of an expended .357 or .38 Special bullet that did not come from the two cartridge casings found at the scene. This suggested that someone fired a revolver at some point,

18

perhaps on the night of the murder, perhaps not. But the evidence was that only Barnes and Fitzhugh were involved in the robbery. Witnesses only saw one shooter and an accomplice was waiting in a car on the side of the road. In light of the jury's not true finding on the allegation that Fitzhugh personally used a weapon that night, we are precluded from finding Fitzhugh fired a gun. (*People v. Curiel* (2023) 15 Cal.5th 433, 465 ["If the jury has made a factual finding, and it is issue preclusive under the principles described above, a court must give effect to that finding"]; see also *People v. Henley* (2022) 85 Cal.App.5th 1003, 1017-1020 [jury's not true finding on the allegation that the defendant personally used a firearm barred the court from concluding in a § 1172.6 resentencing proceeding that she did use a firearm].) Indeed, Aaron testified that Barnes admitted firing a .380 handgun twice and Fitzhugh admitted he was the getaway driver. While it is possible Barnes was armed with two different weapons and fired each of them, such a conclusion would require impermissible speculation.

We agree that while the unaccounted-for spent bullet is puzzling, that fact coupled with Fitzhugh's request that Barnes bring his backpack does not provide substantial evidence that Fitzhugh was armed that night. Accordingly, as we analyze whether substantial evidence supported the trial court's conclusion that Fitzhugh was a major participant who acted with reckless indifference to human life, we will not consider Fitzhugh armed that night.

C.      *Relevant Factors for a Major Participant with Reckless Indifference*

As noted, Senate Bill 1437 amended section 189 to limit the scope of the felony-murder rule, and now requires that the prosecution prove beyond a reasonable doubt that a defendant "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3); see § 1172.6, subds. (a)(3) & (d)(3).) Our Supreme Court clarified the meaning of these requirements in *Banks, supra*, 61 Cal.4th 788 (major participant) and *Clark, supra*, 63 Cal.4th 522 (reckless indifference to human life).

19

To determine whether a defendant was a major participant, the *Banks* court has identified the following considerations: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted.)

Reckless indifference " 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' " (*Emanuel, supra*, 17 Cal.5th at p. 883, quoting *Clark, supra*, 63 Cal.4th at p. 617.) This definition encompasses both subjective and objective elements. (*Emanuel*, at p. 884.) The subjective element requires the defendant to " ' "be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." ' " (*Ibid*.) Objectively, " ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*In re Scoggins* (2020) 9 Cal.5th 667, 677.)

Acknowledging overlap between the major participant and reckless indifference elements (*Clark, supra*, 63 Cal.4th at pp. 614-615), our high court considered a number of factors in determining whether the evidence is sufficient to establish reckless indifference: (1) knowledge of weapons, and use and number of weapons; (2) physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) duration of the crime; (4) the defendant's knowledge of a cohort's likelihood of

20

killing; and (5) the defendant's efforts to minimize the risks of the violence during the felony.  (*Id*. at pp. 618-623.)  As with the major participant factors, " '[*n*]*o one of these considerations is necessary*, nor is any one of them necessarily sufficient.' "  (*Id*. at p. 618, italics added.)

"Since *Clark*, courts have discerned an additional factor that may be relevant to the reckless indifference analysis—the defendant's youth."  (*People v. Keel, supra*, 84 Cal.App.5th at p. 558.)  Indeed, it is now well recognized that minors and young adults are generally less mature and responsible than older adults because they often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them.  (*Ibid*.)  Therefore, the defendant's youthfulness must also be considered when determining whether he or she acted recklessly indifferent to the victim's life.  (*People v. Oliver* (2023) 90 Cal.App.5th 466, 487-488.)

Through use of the major participant with reckless indifference to human life factors, the California Supreme Court established a "spectrum of culpability" informed by two opinions from the Supreme Court of the United States, namely, *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137.  "On one end of the spectrum is Enmund, 'the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' [Citation.]  At the other end is 'the felony murderer who actually killed, attempted to kill, or intended to kill.' [Citation.]"  (*In re Scoggins, supra*, 9 Cal.5th at p. 675; see *Tison*, at pp. 149-150.)  To determine whether the defendant had the requisite mental state, "[w]e analyze the totality of the circumstances."  (*Scoggins*, at p. 677.)

D.    *Sufficiency of Evidence*

    1.    *Major participant*

Fitzhugh argues that the facts only support the conclusion that he planned the robbery and that all the efforts he undertook, such as acquiring guns and ammunition and tracking Evan for months, were actions inherent in planning an armed robbery.  He also

21

seeks credit for attempting to minimize violence by planning the robbery at a time when Britani would not be present. According to Fitzhugh, the plan "simply called for using the weapon as a show of force" to obtain the safe and then the robbers would "bounce." Nothing in the plan, Fitzhugh contends, elevated the risk to human life beyond that inherent in an armed robbery. (See *Clark, supra*, 63 Cal.4th at p. 623.)

In making the above argument, Fitzhugh claims he was nothing more than a major participant. Despite his concession on this point, we briefly discuss the evidence showing he was a major participant because his role as the ringleader in planning and carrying out the robbery is significant to our determination that he acted with reckless indifference. (*In re Loza* (2017) 10 Cal.App.5th 38, 52 ["factors demonstrating [the defendant's] role as a major participant are highly relevant to the analysis of whether he acted with reckless indifference"].)

The plan was discussed for about *six months* prior to the murder. Fitzhugh's original plan was to force Evan, a marijuana dealer, into his home and hold him at gunpoint while other armed robbers stole Evan's safe. The plan was sophisticated, involving guns, boxes of ammunition, bulletproof vests, and multiple accomplices. Given the details of the planning, we may infer he expected resistance and the need to meet that resistance with lethal force. (See *Tison v. Arizona, supra*, 481 U.S. at p. 152.) Fitzhugh also had his accomplices gather information relevant to the robbery, the dissemination of which he sought to control, and Fitzhugh called the shots as to when the robbery would take place.

Text messages illustrate these points. In September and October, text messages demonstrate that Fitzhugh was gathering information from others regarding the location of Evan's safe. On October 6, Fitzhugh told Carlos, "Bruh keep yo mouth shut on dat bidness if we jump the gin to fast that whole licks over it aint for sertain he got the shyt thr." He also texted, "Dnt get erybody ralled up it aint go time," and later, "Once my bitch set eye's on the prize we in there erybody to hungry an aint got all the fact strate ta

22

go in blind." Right after Fitzhugh texted Carlos "Dnt show nobody the rally point meemz will ruin the whole lik," he texted an unknown accomplice "Bby Im ready ta go hav u heard anything new Im locked an loaded ready ta go." Two days later, text exchanges show Fitzhugh recruited accomplices to see if they could catch Evan "slippin" by his house but they were unsuccessful in catching Evan.

The planning continued. On October 20, Fitzhugh texted Carlos that his main focus was Evan. On October 28, Barnes texted Fitzhugh that he was planning to get more shells and already bought gloves. On November 6, Fitzhugh discussed the efficacy of the bulletproof vests with Michael. The planning continued until November 18, when Fitzhugh determined it was time to rob Evan.

Unlike the defendants in *Enmund* and *Banks*, Fitzhugh was instrumental in planning and perpetrating the robbery that led to the attempted murder of Evan and to Britani's death. Similar to the defendant in *In re McDowell* (2020) 55 Cal.App.5th 999, 1011, the robbery he planned consisted of invading the home of a drug dealer with a weapon and was *not* a "garden-variety" robbery. Unlike the defendants in the cases he relies upon, Fitzhugh sought to be well armed and protected against resistance. (See *In re Taylor* (2019) 34 Cal.App.5th 543, 547, 558 [no evidence of resistance to anticipate where the robbery planned was to grab the deposit sack from a liquor store employee]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 988 [where the 15 year-old defendant did not plan the carjacking and had reason to expect that violence was unlikely given the plan to rob " 'just Paisas' " (i.e., not rival gang members but inferior easy targets for crime)]; *Banks, supra*, 61 Cal.4th at p. 811 [the defendant as the getaway driver had no reason to know of a likelihood of resistance].)

2.    *Reckless indifference to human life*

We conclude there is substantial evidence to support the trial court's finding that Fitzhugh acted with reckless indifference to human life. In doing so, we find *Emanuel* distinguishable.

23

In *Emanuel,* the murder victim had arranged to sell a pound of marijuana to defendant Emanuel and his codefendant Whitley. (*Emanuel, supra*, 17 Cal.5th at p. 875.) In order to complete the deal, the victim arranged to meet Emanuel near a park, in the middle of the afternoon. (*Id*. at p. 876.) The evidence suggests that the victim was inside of his truck on a residential street, with the ignition on, when Whitley and Emanuel approached. (*Id*. at p. 877.) Whitley pulled a handgun and demanded the marijuana. When the victim would not give up the marijuana, Emanuel said " 'let's go' " and started to leave. Whitley hit the victim with the gun, then pointed it at the victim's leg. The victim fought back by knocking the gun in a different direction. Whitley's handgun then fired once, striking the victim in the neck. (*Id*. at pp. 878-879.) The victim's truck then lurched backward with enough force to throw him out of the passenger door. (*Id*. at p. 877.) The victim "died at the scene from a 'close-range' gunshot wound to the right side of his neck that perforated his carotid artery." (*Ibid*.)

Applying the factors indicative of reckless indifference to the facts of the case, our Supreme Court concluded that many of the factors were either neutral or did not weigh in favor of a finding of reckless indifference. (*Emanuel, supra*, 17 Cal.5th at p. 896.) Although Emanuel set out to commit a robbery, it would take place in the middle of the afternoon in a public place. Emanuel was not armed, nor did he know Whitley was armed or likely to use lethal force. (*Id*. at p. 895.) "[T]here was nothing in the plan that 'elevated the risk to human life beyond those risks inherent in any armed robbery,' much less a planned unarmed robbery." (*Ibid*.) The crime unfolded without a prolonged period of restraint and, when met with unexpected resistance, Emanuel indicated his intent to end the encounter and walk away. (*Id*. at pp. 895-896.) The court noted that while the lower courts "would have had Emanuel do more to intercede . . . such a mechanical focus on unsuccessful or inadequate efforts at restraint risks imposing murder liability based solely on a defendant's participation in an underlying felony in which a death occurs," which is contrary to current law. (*Ibid*.) Finally, the court found Emanuel's act of fleeing

24

the scene without rendering aid to be ambiguous and that, standing alone, it was insufficient to demonstrate he acted with reckless indifference for human life. (*Ibid*.)

There are few similarities between the instant case and *Emanuel*.

a. Use of Weapons and Knowledge of Cohort's Likelihood of Killing

In his supplemental briefing, Fitzhugh emphasizes that there was evidence that only Barnes was armed, and he contends that using a loaded firearm to threaten someone is different than planning to use a loaded firearm to inflict lethal force and that under these circumstances we cannot infer that Fitzhugh planned to use lethal force. We disagree. Unlike Emanuel, who knew nothing about his cohort's gun, the use of loaded weapons was a critical part of Fitzhugh's plan—not only as tools with which to threaten but as defensive measures against expected resistance. Indeed, Fitzhugh planned to be *heavily* armed, as demonstrated by his multiple attempts to obtain "a few boxes of shells for a few of [his] guns."

This was not a plan to commit a "garden-variety armed robbery." (See *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087-1088 ["Participation 'in a garden-variety armed robbery' where 'death might be possible but not probable' is insufficient. (*Banks*, [*supra*, 61 Cal.4th] at p. 802.)"].) Rather, Fitzhugh spent nearly *half a year* planning, tracking Evan, acquiring bullet proof vests and ammunition, and recruiting multiple accomplices, including Barnes. The details of Fitzhugh's extensive planning reveal he appreciated the likelihood of a cohort's killing someone. There was ample evidence that Fitzhugh and Barnes contemplated armed resistance and were willing to meet such resistance with lethal force, thus demonstrating " 'a willingness to kill (or to assist another in killing) to achieve a distinct aim.' " (*Emanuel, supra*, 17 Cal.5th at p. 883.)

Further, in the commission of the offense, key aspects of the plan remained intact: Barnes was armed and he and Barnes each waited in the dark at Evan's residence to surprise and rob him at gunpoint. Although the number of weapons used in the commission of the offense may have been reduced, this was apparently due to the

25

unavailability of at least one other accomplice, not necessarily a desire to reduce the firepower involved. There was no indication that they no longer expected resistance or a violent encounter. For these reasons, this case is unlike those cited by Fitzhugh. (See, e.g., *People v. Guiffreda* (2023) 87 Cal.App.5th 112, 126 [finding no reckless indifference to human life where the defendant did not use a weapon, nor was there any evidence that she knew a weapon of any kind would be used during the robbery]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 404 [finding no reckless indifference where there was no evidence the defendant was involved in any planning beyond agreeing the group should commit an armed robbery of someone]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1023-1024 [finding the defendant not recklessly indifferent when he was not " 'aware of and willingly involved in the violent manner in which the particular offense [was] committed,' " was across the street during the armed robbery, and there was no plan to shoot the victim].)

       b.   Duration of the Crime and Efforts to Minimize the Risk of Violence

Like in *Emanuel*, the duration of the crime was short, and the duration alone "did nothing to heighten the risk of violence beyond that inherent in the robbery itself." (*Emanuel, supra*, 17 Cal.5th at p. 886.) And we acknowledge that early planning sought to avoid collateral damage to Britani or her parents. Fitzhugh initially often discussed wanting to catch Evan alone, specifically without Britani or her parents around, and that it was difficult to set a date for the robbery because "the parents were always home, Britani was always home." (See *Emanuel*, at pp. 887-888 ["Efforts at the planning stage to minimize the potential for violence . . . are viewed as a distinct factor from efforts to restrain confederates once the felony is underway"].) Fitzhugh argues this demonstrates that he acted with an intent to minimize the danger to Britani, thereby negating reckless indifference.

However, the evidence also shows that the planning went on for many months and Fitzhugh apparently grew impatient with waiting for an opportunity to rob Evan without

Britani present, abandoned his plan to protect Britani, and consciously chose to go forward with a crime with an objectively high risk of violence, ultimately completely disregarding the anticipated danger to Britani, let alone Evan. In this way, the plan changed to *increase* the likelihood of violence. We do not credit Fitzhugh for benevolent intentions he ultimately did not abide by. (See *In re McDowell, supra*, 55 Cal.App.5th at p. 1014 ["A defendant is more culpable when he does nothing to avoid violence despite having time to reflect and consider his options"].) Unlike in *Emanuel*, Fitzhugh's planning specifically contemplated an armed robbery at night, at the home of a drug dealer, using multiple armed accomplices with maximum efforts to protect themselves against an anticipated violent resistance and failed to minimize the overall risk of violence.

Fitzhugh's persistent claim that there was no evidence that he *planned* to hurt or kill Evan or Britani misses the mark. The question of whether Fitzhugh acted with reckless indifference to human life does not turn on whether he disregarded the risk that a cohort would *intentionally* harm or kill; rather, the question is whether he was *willing* to kill in order to achieve a distinct aim, "even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark, supra*, 63 Cal.4th at p. 617.) Where, as here, a defendant's "culpability for [the] murder resides in his [or her] role as planner and organizer, or as the one who set the crime in motion, rather than in his [or her] actions on the ground in the immediate events leading up to [the] murder," the plan must have some aspect "that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id.* at p. 623; see also *In re Taylor, supra*, 34 Cal.App.5th at p. 557.) We conclude that notwithstanding Fitzhugh's initial desire to minimize violence to Britani, several aspects of Fitzhugh's plan elevated the risk of human life beyond those inherent in a "garden-variety armed robbery." (Cf. *Emanuel, supra*, 17 Cal.5th at p. 895 [where the robbery was to be committed in a public place in the middle of the day and it was unknown that a cohort was armed, nothing in the plan elevated the risk].)

c.  Physical Presence and Opportunity to Restrain Barnes or Aid Victims

Fitzhugh argues that when the robbery was actually committed, the plan was downsized to shed indicators of reckless indifference to human life.  He argues that although he purchased bulletproof vests as an original part of the plan, there was no evidence either he or Barnes wore the vests during the robbery murder.  In addition, only one firearm was used, by Barnes, and there was no evidence that Fitzhugh supplied the firearm or that he knew Barnes was likely to use lethal force.  He insists the only role he played in the robbery that night was as the getaway driver; he had no direct involvement in the short-lived robbery and therefore could not intervene or render aid.  According to Fitzhugh, the circumstances all point to Barnes's violent reaction as an impulsive response to Evan's and Britani's unexpected resistance and that Barnes fired the gun "accidentally," " 'blindly,' " without intent.  Fitzhugh further claims that because he was sitting in the car down the road and because Britani almost certainly died instantly, there was nothing he could do to restrain Barnes and/or render aid.  We disagree.

Even if the parameters of the commission of the offense deviated from the original plan, Fitzhugh's involvement in the commission of the offense weighs in favor of reckless indifference to human life.  He drove Barnes to the house to commit the armed robbery.  Fitzhugh knew Barnes was armed and, from the cell phone records, it appears they spent 20 minutes lying in wait for Evan to return home.  During that time, they made five calls to each other; the last one was six minutes before the first 911 call.  Given Fitzhugh's position as the mastermind, shot caller, and lookout, he was in the uniquely ideal position to call off the armed robbery or to otherwise minimize the risk of violence.  He did neither.  For example, Fitzhugh could have minimized the risk to others by instructing Barnes to only proceed with the robbery if Evan was alone, but there was no evidence he did so.  In addition, from the route Britani and Evan took coming home and the location of Fitzhugh's car, the evidence suggests Fitzhugh would have likely seen and

28

recognized Britani's car arriving.[16]  There was no evidence he called off the robbery when Britani's car (with Britani in it) arrived home.  In contrast to *Emanuel*, no evidence suggests Fitzhugh was willing to abandon "the plan rather than resort to greater violence." (*Emanuel, supra*, 17 Cal.5th at p. 891.)

Nor did he attempt to aid the victims.  This factor too militates in favor of finding reckless indifference.  Although he was parked on the street by Britani's house, Fitzhugh heard two shots and Britani's scream, yet he did nothing to render aid or inquire of Britani's wellbeing.  When Barnes ran back to the car, they turned off their headlights and drove away.  Unlike the defendant in *Clark* who arrived on the scene at the same time as police then left, Fitzhugh *left* the scene without knowing that help in the form of police or medical intervention was forthcoming.  (Compare *Clark, supra*, 63 Cal.4th at p. 620 with *Tison v. Arizona, supra*, 481 U.S. at p. 141 [noting the Tison brothers' failure to make an effort to help the victims].)  Even if, as in *Emanuel*, we conclude Fitzhugh's conduct after the shooting is ambiguous because it may reflect either a lack of disregard for the victim's welfare and/or a desire to avoid arrest, unlike in *Emanuel*, this factor is not standing alone in demonstrating Fitzhugh's reckless indifference to human life. (*Emanuel, supra*, 17 Cal.5th at p. 896.)

d.  Totality of the Circumstances

Applying the relevant factors in accordance with our standard of review and our high court's guidance in *Emanuel*, we conclude the totality of circumstances demonstrates Fitzhugh acted with reckless indifference to human life, i.e., "at the time of

___

[16]    Fitzhugh told Aaron he was parked on the street by Britani's house.  Evan testified Britani drove north on US-99, took the Acampo exit (which is south of her home), turned left, and drove to the house at the end of the road.  A neighbor who lived across the street from Britani testified that, on the night of the murder, he heard gunshots and saw a person run south to a waiting vehicle that drove off to the north.  The evidence established Fitzhugh recognized Britani's car and knew she drove Evan around.

the shooting, the defendant acted with indifference toward the grave risk that someone *could* be killed." (*Emanuel, supra*, 17 Cal.5th at p. 895.) We agree with the trial court that this case is different from *Clark*, where there was only one gun at the scene, which was not supposed to be loaded, and only had one bullet. (*Clark, supra*, 63 Cal.4th at pp. 621-622.) Nor is it like *Scoggins*, where none of the perpetrators were supposed to be armed during a planned daytime beating to get the defendant's money back. (*In re Scoggins, supra*, 9 Cal.5th at pp. 671, 679, 682, 683.) And as discussed, *supra*, this case is also unlike *Emanuel*, where the defendant did not know his cohort was armed and was willing to walk away from the robbery when the victim resisted. (*Emanual*, at p. 896.) Here, the evidence established that Fitzhugh's plan for the robbery always incorporated loaded firearms as an integral part of the plan and that did not change on the night of the robbery. Moreover, a reasonable inference that Fitzhugh intended to use more than minimally loaded firearms may be drawn from the fact that Fitzhugh repeatedly asked for more "shells" and "artillery" in order to rob Evan and Barnes himself intended to obtain more shells a few weeks prior. While we acknowledge the aider and abettor's awareness that a firearm will be used in the commission of the underlying felony is not sufficient of itself in determining reckless indifference, it is nevertheless significant. (*Clark*, at p. 618.) Here, the evidence showed more than mere knowledge of a presence of a gun; Fitzhugh's plan required use of a *loaded* firearm to threaten Evan and the totality of the circumstances demonstrates a willingness to use the bullets (and thus lethal force) if necessary. Indeed, Fitzhugh anticipated a violent encounter.

Also in contrast, the defendants in *Scoggins, Taylor*, and *Clark* planned more "garden-variety armed robberies" and took steps to minimize the risk of violence. In *Scoggins*, the defendant's plan called for his multiple accomplices to rob a single victim in a public parking lot in broad daylight, using no weapons. (*In re Scoggins, supra*, 9 Cal.5th at pp. 671-672, 683.) In *Taylor*, the defendant's plan was to rob a liquor store clerk at night as the clerk was depositing bank deposits by grabbing the bag and driving

30

away. (*In re Taylor, supra*, 34 Cal.App.5th at p. 547.) In *Clark*, the defendant's plan was to rob a retail store, after business hours when few employees would be present, using a single unloaded gun. None of these plans "elevated the risk to human life beyond those risks inherent in any armed robbery." (*Clark, supra*, 63 Cal.4th at p. 623; see *Scoggins*, at pp. 682-683, *Taylor*, at p. 559.) Here, in contrast, the robbery took place in the evening, at a home where three different family units lived, and at a time when it would be likely that many of the family members would be home and their safety implicated, but not so late so that if trouble roused them from sleep they would be slower to react and likely avoid encountering the defendants. And, the evidence also suggested that Evan sold marijuana from Britani's apartment; customers getting caught up in the robbery was also a possibility. (See *In re McDowell, supra*, 55 Cal.App.5th at p. 1013 [where it was foreseeable that customers or others could be present during the early morning robbery of a drug dealer was relevant to a reckless indifference to human life determination].) Even if Fitzhugh and Barnes did not arm or armor themselves according to the original plan, there is no evidence their anticipation of resistance changed that night, which was logical given the plan to rob a successful marijuana dealer.

Although some factors are favorable to Fitzhugh, such as the short duration of the botched robbery and his limited actions during the armed robbery, reviewing the entire record in the light most favorable to the judgment, we ignore competing inferences that could lead to a contrary conclusion. (*People v. Rodriguez* (2021) 66 Cal.App.5th 749, 772-773.) Sufficient evidence supports the court's conclusion Fitzhugh acted with reckless indifference to human life. (See *Clark, supra*, 63 Cal.4th at p. 619 [noting reckless indifference of an observing accomplice might be found where "the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force"].)

31

*E.      Fitzhugh's Youthfulness*

At the evidentiary hearing, defense counsel told the court that Fitzhugh was 21 years old at the time of the shooting and as a result of his youthfulness, "failed to appreciate the risk of death his plan posed." He also cited to case law where courts found diminished culpability due to the offender's youthfulness. In addition, Fitzhugh requested a hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 and section 3015. In providing a detailed explanation of its denial of the resentencing motion, however, the court did not mention Fitzhugh's age or maturity level.

On appeal, Fitzhugh argues that his overconfidence that the robbery would be simple and easy and that nobody would get hurt demonstrates that his youth affected his ability to subjectively appreciate the potential risks in committing this offense. He argues the court's failure to consider his youthfulness requires a new evidentiary hearing in light of cases holding that a defendant's age must be considered when determining whether the defendant was a major participant who acted with reckless indifference to human life. (E.g., *People v. Harris* (2021) 60 Cal.App.5th 939, 960 ["given Harris's youth at the time of the crime [17 years old], particularly in light of subsequent case law's recognition of the science relating to adolescent brain development [citations], it is far from clear that Harris was actually aware 'of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants' "];[17] *In re Moore* (2021) 68 Cal.App.5th 434, 451, 454 [a "defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life"; the 16-year-old defendant was not shown to have acted with reckless indifference, in part due

---

[17]    The California Supreme Court granted a petition for review April 28, 2021, case No. S267801. Review was dismissed September 28, 2022, with language that that this case "is noncitable and nonprecedential 'to the extent it is inconsistent with' our decision in *Lewis*." (*People v. Harris, supra*, 60 Cal.App.5th, review dism. Sept. 28, 2022.)

to his youth at the time of the offenses, lack of participation in the robbery, and unawareness of the shooter's propensity for violence]; *People v. Ramirez, supra*, 71 Cal.App.5th at pp. 990-991 [no substantial evidence that 15 year old acted with reckless indifference to life in light of his youth]; accord *In re Harper* (2022) 76 Cal.App.5th 450, 467-472 [habeas corpus petition denied where the defendant's youth, even if a factor, did not change his culpability because the evidence showed he knew the plan was to kill the victim].)

The fact that the court did not specifically mention certain evidence does not necessarily mean that the court ignored evidence of his youthfulness. Fitzhugh's evidentiary hearing was held in 2023, well after *Harris*, *Moore*, *Ramirez*, and *Harper* were issued. Accordingly, we presume the trial court followed the law in exercising its duties and duly considered the evidence presented to it. (*In re Julian R.* (2009) 47 Cal.4th 487, 499; *People v. Nance* (1991) 1 Cal.App.4th 1453, 1456.) Even if the court did not consider Fitzhugh's youthfulness, any such error is harmless under the specific circumstances of this case. (See *People v. Oliver, supra*, 90 Cal.App.5th at pp. 488-489.)

We note Fitzhugh was already 21 years old at the time of the shooting and, "while *Harris*, *Moore*, and related cases were premised on scientific findings regarding adolescent brain development, the defendant in *Harris* was 17 years old, and the defendant in *Moore* was just 16." (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1092-1093, citing *People v. Harris, supra*, 60 Cal.App.5th at p. 960; *In re Moore, supra*, 68 Cal.App.5th at p. 454.) "Presumably, the presumption of immaturity weakens as a defendant approaches 26." (*People v. Oliver, supra*, 90 Cal.App.5th at p. 489.) "[T]he case law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence: (1) their relative impulsivity; and (2) their vulnerability to peer pressure." (*Ibid.*, citing, e.g., *Miller v. Alabama* (2012) 567 U.S. 460, 461.)

There is no evidence in this case that Fitzhugh's criminal behavior was motivated by either of these two factors. Rather, the record supports the trial court's finding that Fitzhugh was the driving force behind the commission of the armed robbery. His texts show that, over several months, he was singularly focused on using weapons to rob Evan. He was the one who decided to commit the robbery that night and enlisted Barnes's help. Although the evidence shows the decision to commit the robbery on that particular night was made somewhat last minute, the evidence does not show this decision was borne out of the traditional notion of impulsivity associated with youthful offenders. In other words, Fitzhugh was not the victim of peer pressure, "swept up in circumstances beyond his or her control that led to an unintended death." (*People v. Oliver, supra*, 90 Cal.App.5th at pp. 489-490.) Rather, the evidence demonstrates that Fitzhugh planned the robbery and, while he hoped for better conditions in which to commit it, he went ahead with the robbery when those conditions did not arise. Fitzhugh made an intentional and volitional choice to take a calculated risk in committing the robbery that night. That risk failed to turn out as he had hoped but we see no reasonable likelihood that the trial court would have reached a different conclusion had it focused specifically on his age.

Finally, Fitzhugh has failed to present on appeal or in the court below any *specific support* for the proposition that his level of maturity somehow lessened his culpability for this murder. To the contrary, Fitzhugh's presentence report is part of our record, and our review discloses nothing remarkable in his childhood. (Cf. *People v. Jones, supra*, 86 Cal.App.5th at p. 1091 [the petitioner presented evidence of his "traumatic and violent" upbringing as well as under-diagnosed mental health and substance abuse issues, and "appeared to be impulsive rather than criminally sophisticated"].)

Accordingly, even considering Fitzhugh's youthfulness, we conclude from the totality of the circumstances that substantial evidence supports the trial court's finding that Fitzhugh acted with reckless indifference to human life.

## DISPOSITION

The trial court's order denying Fitzhugh's petition for resentencing under section 1172.6 is affirmed.

_____/s/_____
EARL, P. J.

We concur:

_____/s/_____
RENNER, J.

_____/s/_____
BOULWARE EURIE, J.